# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 27, 2020 Session

## STATE OF TENNESSEE v. VONDA STAR SMITH

**Appeal from the Criminal Court for Greene County**
**No. 17CR136   John F. Dugger, Jr., Judge**

_____

### No. E2019-00968-CCA-R3-CD

_____

The Defendant, Vonda Star Smith, was convicted by a Greene County Criminal Court jury of first degree premeditated murder and second degree murder. *See* T.C.A. §§ 39-13-202(a)(1) (2018) (first degree murder) (subsequently amended), 39-13-210 (2014) (second degree murder) (subsequently amended), 39-13-214 (2018) (embryo or fetus as a victim of criminal homicide). The trial court sentenced the Defendant to life for first degree murder and to twenty-five years as a Range I offender for second degree murder, and the court imposed the sentences concurrently. On appeal, the Defendant contends that (1) the evidence is insufficient to support her convictions, (2) the court erred in denying her motion to dismiss because the State's failure to provide exculpatory information regarding the victim's cell phone "ping" violated her right to due process, (3) the State's failure to provide a witness's statement during discovery deprived her of due process, (4) the court improperly commented on the evidence during a defense witness's testimony, (5) cumulative errors require reversal of the Defendant's convictions, and (6) the court erred in imposing a twenty-five-year sentence for second degree murder. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Gene G. Scott (at trial and on appeal) and Leslie Tiller (at trial), Jonesborough, Tennessee, for the Appellant, Vonda Star Smith.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Dan E. Armstrong, District Attorney General; Cecil C. Mills, Jr., and David Baker, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to the death of the twenty-one-year-old victim, Jessie Morrison,[1] and the victim's unborn child. The victim's body was found in a remote area of Greene County on August 12, 2016. She had suffered multiple blunt force injuries to her head. The Defendant is the paternal grandmother of C., who is of one of the victim's two living children.

At the trial, Donald Conn, Jr., testified that on August 12, 2016, he took his dog for a walk on Jud Neal Loop, a short, one-lane circle with four or five houses that was not frequently traveled. He said people sometimes dumped trash and animal carcasses "down the creek" on Jud Neal Loop. He said that as he walked toward a creek on the side of the road, he saw a woman's body next to two trees that were near a barbed-wire fence. He said she was face down and that the back of her head was "smashed." He said she had "two slits on her arm" that were not bleeding. He said he saw "a couple of flies" around the body. He said he did not approach the body, which was about seven feet away. He said that he went home and that his wife called 9-1-1. He said that he showed law enforcement officers where to find the body and that he answered the officers' questions. He agreed that Officer Morgan asked to see his hands to determine if Mr. Conn had any injuries.

The victim's sixteen-year-old sister testified that she visited the victim at the victim's house for about thirty minutes on August 11, 2016. The victim's sister said her father and the victim's two sons were also present. The victim's sister identified the victim's children as C., who was the Defendant's son's child, and K, who was the younger of the two. The victim's sister said she and the victim discussed C.'s oral surgery scheduled for the next morning. The victim's sister said the victim used the victim's sister's cell phone to determine the location of the surgery.

The victim's sister testified that the victim was supposed to call her after C.'s surgery on August 12, 2016, but that the victim did not call her or send her a text message. The victim's sister said that she went to her aunt's house after school and that while she was there, her father called. She said that after the call, she went with her father to the victim's house, arriving around 7:30 p.m. She said that Gary Ealey, the victim's fiancé, was home but that she did not find the victim. She said she did not go inside the house. She said Mr. Ealey's father, J.D. Ealey, also lived with the victim and Mr. Ealey. The

---

[1] For purposes of the recitation of facts, we will refer to Ms. Morrison as "the victim." We in no way diminish the loss of Ms. Morrison's fetus, to whom we will refer as the "the fetal victim."

victim's sister said that she obtained the Defendant's cell phone number from her father and that she called the Defendant around 7:40 p.m., who did not answer. The victim's sister said the Defendant answered when the victim's sister called a second time. The victim's sister said that she asked the Defendant if the victim were with the Defendant and that the Defendant stated she had dropped off the victim and the victim's children at the victim's house. The victim's sister said the victim's children were not at the victim's house. The victim's sister said the Defendant stated that she was at "William's picking up [E.]" and that she did not know the location of the victim and the victim's children. The victim's sister said E. was the Defendant's granddaughter or step-grandaughter.

The victim's sister testified that she and her father went to her mother, Tammy Morrison's, house to get a chainsaw. The victim's sister said she told Ms. Morrison that the victim was "MIA . . . Missing in action." The victim's sister said she and her father went to her father's house, ate dinner, and went to bed. She said her father awakened her around 3:00 to 4:00 a.m. after receiving a call from Ms. Morrison. The victim's sister said she and her father went to the Greene County Sheriff's Department, where they were informed that the victim had been killed.

The victim's sister testified that the victim had been about twenty weeks' pregnant and that the victim's pregnancy was "starting to show."

The victim's sister testified that after she left the Sheriff's Department, she went to the victim's house to get clothing for the victim's children. The victim's sister said she went to the Defendant's house to get the victim's children after getting the clothes. The victim's sister said that a detective was "on the porch" at the Defendant's house and that E. and the Defendant's husband, Roger Smith, were at the house, but that the Defendant was not home.

Tammy Morrison testified that the victim had shared a home with Mr. Ealey and the victim's two children. Ms. Morrison said the victim and Mr. Ealey had dated for about one year and had broken up for a couple of months around March 2016. Ms. Morrison said C. had been three years old and K. had been one year old when the victim died.

Ms. Morrison testified that she had received a text message from the victim while the victim had been at the hospital for C.'s oral surgery on August 12, 2016, around 11:40 to 11:45 a.m. Ms. Morrison said she and the victim had planned earlier in the week for Ms. Morrison to spend the night at the victim's house on the night of August 12 in order for Ms. Morrison to help the victim care for C. after his surgery. Ms. Morrison said she waited at home but never heard from the victim that evening.

Ms. Morrison testified that one of her daughters and the daughter's father came to her house on August 12, 2016, to retrieve a chainsaw. Ms. Morrison said that she had told her daughter that she was going to the victim's house later and that her daughter had said,

"[G]ood luck, she's MIA." Ms. Morrison said she left her house, took a television to her daughter Kayla's boyfriend's house, went to a grocery store to buy food for C., stopped to buy cigarettes for the victim, and went to the victim's house. She said she arrived at the victim's house around 9:00 p.m. Ms. Morrison said Mr. Ealey sat in the living room working on a motor. Ms. Morrison said groceries sat on the floor, on the counter, and on the stove in the kitchen. She said Mr. Ealey asked if she had seen the victim and stated that he said he hoped the victim had been with Ms. Morrison.

Ms. Morrison testified that she called the Defendant "to see where [the victim] was" but that the Defendant did not answer. Ms. Morrison said she and Mr. Ealey went to the Defendant's house because he stated he last saw the victim with the Defendant. Ms. Morrison said C. was the Defendant's grandson.

Ms. Morrison testified that she arrived at the Defendant's house around 10:00 to 10:30 p.m. Ms. Morrison said the Defendant's car was "backed up on a hill past her house a little bit," which was not where the Defendant usually parked. Ms. Morrison acknowledged, however, that she had only been to the Defendant's house on two or three previous occasions. Ms. Morrison said that she could see movement inside the Defendant's house but that no one answered when she knocked. Ms. Morrison said she beat on the Defendant's door and "told [Mr. Ealey] to back up because if [the Defendant] couldn't open it, I would and call the law." Ms. Morrison said the Defendant opened the door. Ms. Morrison said the Defendant's husband, C., K., and a girl, E., whom the Defendant "calls her granddaughter" were at the Defendant's house. Ms. Morrison said that she asked the Defendant where the victim was and that the Defendant said "she dropped her off hours ago." Ms. Morrison said the Defendant claimed the victim had come to the Defendant's workplace with C. and K. and "said she couldn't deal with them anymore." Ms. Morrison said she kept questioning the Defendant because "something was just out of place, didn't feel right." Ms. Morrison said the victim would not have left C. after he had just had surgery. Ms. Morrison said that the Defendant said she had given the victim $1100 that day. Ms. Morrison said the Defendant asked Mr. Ealey "if he had a problem with them keeping the kids, too." Ms. Morrison said that she was at the Defendant's house for twenty to twenty-five minutes and that the Defendant wore "a big T-shirt and a pair of capris." Ms. Morrison said the Defendant did not seem concerned and did not offer to help find the victim. Ms. Morrison said that C. wanted to leave with her but that she did not take the children when she left because she did not have car seats with her.

Ms. Morrison testified that she returned to the victim's house for fifteen to twenty minutes to look for clues regarding the victim's whereabouts but that she did not find anything. Ms. Morrison said she called the Defendant at "[s]omething till twelve [a.m.]" to tell the Defendant that she had not found the victim, that she was going to the Sheriff's Department, and that she would return for C. thereafter. Ms. Morrison said the Defendant "told me she would too if it was her daughter."

Ms. Morrison testified that she arrived at the Sheriff's Department around 11:40 to 11:45 p.m. She said she asked to file a missing person's report, that an officer told her they "normally did not take them that soon," and that the officer took statements from Mr. Ealey and her. She said she described the victim's tattoos and provided photographs of the tattoos. She said that, unbeknownst to her, the authorities had already discovered the victim's body at this point but that they had been unable to identify it until she provided the tattoo information. Ms. Morrison said her former husband and Cheyenne came to pick her up at the Sheriff's Department around 5:00 a.m. Ms. Morrison said her former husband and Cheyenne took her to the victim's house to get the children's car seats from the victim's car. Ms. Morrison said she returned to the Defendant's house to get the children.

Ms. Morrison acknowledged that the Defendant called her at 12:47 a.m. and 1:58 a.m. on August 13, 2016.

Greene County Sheriff's Department Deputy Daniel Ricker testified that he was a detective at the time of the victim's death. He said he responded to the scene at Jud Neal Loop around 9:30 p.m. He said the area was "very rural," with few houses on the one-lane road. He said the surrounding area was hilly, had creeks, and was wooded. He said the victim's body lay "partially over an embankment in a wooded area. He said the victim appeared to have suffered significant head trauma and had reddish-brown stains on her clothing. He identified photographs of the victim's body at the scene, and the photographs were received as exhibits. He said that Tennessee Bureau of Investigation (TBI) agents processed the crime scene for evidence.

Deputy Ricker testified that he went to the Defendant's house around 2:00 a.m. on August 13, 2016, after learning that she had been the last person seen with the victim. He said the Defendant's house was about four to five miles from where the victim's body was found. He said a white Pontiac Sunfire car was parked "out from the porch of the house, the front end . . . was pointed toward the woods up the hill from the house." He said that he knew the victim had been beaten and that he did not see any injuries on the Defendant. He agreed that the Defendant allowed him to come inside her house, that she was cooperative, and that other officers searched the house with the Defendant's consent. He said that he interviewed the Defendant and that the interview was recorded.

The recording of the Defendant's interview at her house was played for the jury. In the recording, the Defendant stated, "I don't know what's going on here. . . . I think I'm getting two sides to everything." She said, "I'm getting one side from Jessie [the victim]. . . . And one side from somebody else." She said Ms. Morrison did not know that the Defendant kept "these boys most of the time." The Defendant stated that she had been supposed to babysit C. and K. for the weekend but that the victim had sent her a text message that day, which was a Friday, in which the victim said she was going to keep the children at home. The Defendant stated she had last seen the victim that evening when the victim came to the Defendant's workplace with C. The Defendant said the victim "couldn't

do anything with [C.]" and wanted the Defendant to care for him. The Defendant said she gave the victim a check for $100 for C.'s medication. The Defendant stated that the victim was pregnant and that the victim lived with Mr. Ealey, the father of the fetal victim. The Defendant said that she took the victim to Food City and bought groceries for the victim around 5:00 or 6:00 p.m. The Defendant later said this was around 2:00 p.m. The Defendant stated that at a time that day which the Defendant did not specify, the victim had cried and been upset over her financial situation. The Defendant said Mr. Ealey had the victim's car, which was "tore up." The Defendant said they dropped off some of the groceries at the victim's house and went to the Defendant's house. The Defendant said that at her house, she gave the victim $1000 in cash and that the victim left in the Defendant's car to pay bills around 4:00 or 5:00 p.m. The Defendant stated she gave the victim the money for a car payment because the victim's car was about to be repossessed, for utilities, for rent, and for "phone minutes." The Defendant said the victim returned with the Defendant's car around 6:00 or 7:00 p.m., left the keys in the car, and was picked up by a tall male with light hair in a white van. The Defendant said she "assumed it was [Mr. Ealey] but it wasn't." The Defendant said the last time she saw the victim was when the victim was in the white van, but the Defendant later said she never saw the victim and had only seen the man driving the van. The Defendant said she had seen two white vans at the victim's house when the Defendant had been there to pick up C. and K. The Defendant said that while the victim was gone in the Defendant's car, E. and "Mammaw," whom other evidence showed was Sharon Burgner, had called the Defendant repeatedly about picking up E. The Defendant said she left to pick up E. after her car was returned. The Defendant said that in a conversation with Ms. Morrison when Ms. Morrison came to the Defendant's house around 11:00 p.m., the Defendant had told Ms. Morrison that the Defendant kept the victim's children three to four days a week. The Defendant said the victim and Mr. Ealey "were . . . into it over" the Defendant's "getting [the children] all the time." When asked if the victim had a drug problem, the Defendant said she did not know, that "we got into it," and "like I said I didn't know that it [wasn't] there. You know I didn't have no reason." The Defendant did not offer any further explanation as to what "[wasn't] there." She referred to asking Mr. Ealey something, but she did not explain what she asked him. She said he "swore he didn't." She said that she did not know Mr. Ealey well and that Mr. Ealey and the victim "had a bunch hanging around" at the home Mr. Ealey and the victim shared. The Defendant said Mr. Ealey "was going to be mad" at the victim for leaving the children with the Defendant earlier that day. The Defendant said that Mr. Ealey would not want the Defendant's son, William, to be present with the children.

In the interview, the Defendant identified her white car and said the officers could look inside it. She said that they would smell cat urine in it, that a cat had been in the car when she left the windows down, and that she had attempted to clean the urine with Clorox earlier in the week. She said that E. had objected to the residual smell earlier that day and that she had a "cover" on which E. sat when the Defendant picked up E. The Defendant stated that her car had spots that had been there when she bought the car. The Defendant consented for her car to be towed and searched.

Deputy Ricker testified that the Defendant signed a consent to search form for her Pontiac Sunfire on August 13, 2016 at 2:55 a.m. He said the car's passenger seat had reddish-brown stains and something dark "in the seat." He said he and TBI Agent J.J. Sipos sealed the car's openings with tape and that the car was towed from the Defendant's house. He identified photographs of the car's interior, which were received as exhibits.

Deputy Ricker testified that the Defendant agreed to come to the Sheriff's Department for a second interview, which he conducted beginning at 4:26 a.m. on August 13, 2016. He said Agent Sipos, Detective Michelle Holt, and Detective James Randolph were also present.

The recording of the Defendant's interview at the Sheriff's Department was played for the jury. In the interview, the Defendant stated that the victim came to the Defendant's place of employment around 1:00 p.m. the previous afternoon, that the Defendant and the victim left shortly after 2:00 p.m., that they drove to Mr. Ealey's employer, "Emory's Lectro Minerals," where the victim left her car for Mr. Ealey to drive home. The Defendant said the victim got into the Defendant's car, a white Sunfire. The Defendant said that they went to Food City, that a receipt showed they were at Food City at 3:30 p.m., that they took groceries to the victim's house, and that they went to the Defendant's house. The Defendant said that she had given the victim a check for $100 when they were at the Defendant's place of employment and that the Defendant gave the victim $1000 in $100 bills for the victim "to catch her payments up." The Defendant said the victim left the Defendant's house to pay bills around 4:00 to 5:00 p.m. The Defendant said her car was returned around 7:00 p.m. The Defendant said she thought Mr. Ealey had been the van's driver but that she did not pay attention because she knew Mr. Ealey was mad at her. She thought the van was one of the two she had seen previously. The Defendant said she left with "the baby" to pick up E.

In the statement, the Defendant said it was normal for her to keep the children and give money to the victim. She said, "It's like nobody knows that. It's just me." She said that she had paid to have the victim's electricity reconnected after it had been turned off and that she tried to help the victim. She estimated that over the past year, she had given the victim money every week to two weeks. The Defendant said she did not understand why no one else knew about what she had done to help the victim. The Defendant said she loved the victim and could not allow the victim and the victim's children to "do without." The Defendant said that she and the victim had not argued and that the victim thought she had been "in the middle" of Mr. Ealey and the Defendant. The Defendant said that Ms. Morrison had come to her house the previous night and that the Defendant had not known the victim and her mother were speaking. The Defendant said the victim had told the Defendant that Ms. Morrison abused alcohol and drugs and that the victim did not speak to her mother. The Defendant said Ms. Morrison had said she had taken groceries to the victim the previous evening. The Defendant said she had been "under the impression of

one thing and it's not." The Defendant said that she was not upset with the victim, that she was "learning like you all are learning right now," and that she was "shocked." The Defendant said that the victim and Mr. Ealey had broken up previously, that the victim had a relationship with the Defendant's son,[2] and that when the victim and Gary Ealey reunited, Mr. Ealey did not want the Defendant and the Defendant's son "in the picture." The Defendant said the victim had stayed at the Defendant's house while the victim and Mr. Ealey were separated. The Defendant said Mr. Ealey also did not like one of the victim's children and did not like K.'s father, "Shawn." Regarding other individuals who had told the investigators that the victim had been a sweet, devoted, loving mother, the Defendant stated these people had not known the Defendant kept the children three to four days a week. The Defendant said that anyone who said the victim had been with the children twenty-four hours a day, seven days a week, was incorrect. The Defendant said that she picked up the children when she left work, that they stayed with her overnight, and that she dropped them off the next day on her way to work.

In the interview, the Defendant denied that she had been mad at the victim and Mr. Ealey the previous week when the victim had said she was taking the children swimming at Ms. Morrison's house instead of having them stay with the Defendant for the weekend. The Defendant denied that she had slammed her door, revved her engine, and driven quickly from the neighborhood where the victim and Mr. Ealey lived. The Defendant said she gave the victim $30 the previous week.

In the interview, the Defendant said she kept the victim's children for four days around Father's Day because Shawn had been in town and the victim did not want Shawn to see the children. The Defendant said the victim told her no one, including Ms. Morrison, was to see the children. The Defendant said the victim stated Ms. Morrison had taken the children to see Shawn in the past.

In the interview, the Defendant said that E. called her repeatedly when the Defendant did not go to Ms. Burgner's house to pick up E. after E. came home from school the previous day. The Defendant said she did not talk to E. to tell E. she would come when the victim returned with the Defendant's car because "[s]he's jealous." The Defendant thought she got to Ms. Burgner's house to pick up E. around 7:00 p.m. The Defendant said she did not try to call the victim when the victim was gone in the Defendant's car because the victim "didn't have minutes" on the victim's cell phone.

In the interview, the Defendant said that the cat urinated in her car on Wednesday and that she cleaned the car on Wednesday. She denied that she cleaned the car on Friday, the day the victim was killed. The Defendant said she and Ms. Burgner put a towel on the

---

[2] Other evidence showed that the Defendant's son was C.'s father.

- 8 -

car seat because E. had not wanted to sit in the car. The Defendant said E. "gags and pukes." The Defendant said the stains in her car had been there when she bought the car. The Defendant said her car had not had blood in it when she picked up E. The Defendant said Ms. Burgner had stood next to the car to hand tomatoes to the Defendant.

In the interview, the Defendant gave consent for the investigators to download the contents of her cell phone. She said she did not know the location of Tyne Gray Road and did not know who lived there that the victim and Mr. Ealey might know.

After the interview was played for the jury, Deputy Ricker testified that items of interest were found scattered on Betsy Ross Road, which was about three miles from Jud Neal Loop and three to four miles from the Defendant's house. He said he went to the location where the items were found on the morning of August 13, 2016, after the Defendant's interview. He said he and Agent Sipos collected "various papers" and a pair of children's shorts. He identified photographs of the items, which were received as exhibits. He described one of the items collected as a checklist from a medical office "for someone that would have had some sort of procedure." He identified other items as medical paperwork related to C. and driving information for Johnson City Medical Center. He identified a piece of paper with notes related to C.'s surgery and telephone numbers for reaching medical personnel.

Food City District Loss Prevention Manager Kenny Collins testified that he provided law enforcement with video surveillance footage from a Food City store for August 12, 2016. The surveillance footage was played for the jury and showed two women and two children at the store, along with other customers and employees. Mr. Collins said the surveillance footage showed the women entering the store at 3:07:06 and driving away at 3:43:43.

TBI Assistant Special Agent-in-Charge Chris Wilhoit testified that he arrived at Jud Neal Loop around 9:30 p.m. on August 12, 2016, after being contacted by local authorities for assistance with the investigation of the victim's death. Agent Wilhoit said that the victim's body lay across barbed wire on the side of the narrow road, about ten to fifteen feet from the road. A video recording Agent Wilhoit made of the scene before the victim's body was removed was played for the jury. Agent Wilhoit identified photographs of the victim's body, which were received as exhibits.

Former Greene County Sheriff's Department Detective James Randolph testified that he responded to the scene at Jud Neal Road around 8:52 p.m. on August 12, 2016. He identified photographs he took, which were received as exhibits. He said that the victim's skull was "busted" and that it looked as if she had been shot. He said the victim had bruises on her arms, cuts on her hands, what appeared to be a broken finger, and what appeared to be a bloody thumb print on her left side.

Mr. Randolph testified that he, Deputy Ricker, and Agent Sipos left the scene and went to the Defendant's house based on information from Ms. Morrison. He said he did not see any injuries on the Defendant. He said they searched the Defendant's house and car with her permission. He said the seat, console, and corner of the inside passenger-side windshield had reddish brown stains. He said he saw a circular pattern on the passenger-side window.

Mr. Randolph testified that after the Defendant's interview at the Sheriff's Department on August 13, 2016, he went to Tyne Gray Road and found a pair of shorts, a diaper, and paperwork related to the victim's child who had gone to the doctor on August 12. He said he continued searching on Babbs Mill Road, where he found pieces of the victim's cell phone cover, a medical wristband with C.'s name printed on it, pieces of the victim's driver's license, a pack of Marlboro cigarettes, and a bag of cereal. He said he found a napkin or paper towel containing blood on Jud Neal Loop. The items were collected as evidence.

TBI Special Agent Forensic Scientist Melanie Carlisle, an expert in processing vehicle evidence, testified that she and other members of a team processed a 2005 white Pontiac Sunfire on August 17, 2016, that had been brought to the TBI Crime Laboratory the previous day. She identified numerous photographs of the car's interior and exterior, which were received as exhibits. Some of the photographs show that the car was a two-door vehicle. She said that both the exterior and interior had reddish brown stains. Some of the photographs depict extensive reddish brown stains on the front passenger seat and the front passenger floorboard. She said the driver's seat had a reddish brown stain on the middle bottom, "sort of directly even with the steering wheel."

Agent Carlisle testified that presumptive blood tests were performed on stains from the front passenger seat, back of the front passenger seat, front passenger floorboard, front passenger headrest, ceiling, console at the gear shift, console near the radio and heat controls, passenger doorjamb, passenger rear floorboard, passenger sun visor, and driver's seat, that all tested presumptively positive for blood, and that all were submitted for further testing. She said a Mountain Dew bottle with a reddish brown stain was collected and submitted for further testing. She said a reddish brown stain from the exterior top passenger side of the car contained a hair but that no testing was done because the TBI did not perform DNA hair testing. She said DNA hair testing could be done by another laboratory if the district attorney general or the defense requested it.

Agent Carlisle testified that evidence was collected from the interior and exterior of the car for latent fingerprint identification analysis. She said that Super Glue fumes were used in the process and that after the fumes were used, the inside of the passenger door window and the interior windshield on the passenger side had white streaks and swirl marks, which she described as looking like a mirror that had been cleaned with water.

- 10 -

TBI Special Agent John Joseph Sipos III testified that he arrived at the scene on Jud Neal Loop around 10:00 or 10:30 p.m. on August 12, 2016. He said the victim's body lay off the side of the road, on a down slope in a grassy area. Referring to a photograph exhibit, he identified what he said appeared to be a fingerprint on the victim's body, which he thought was rubbed off during the process of placing the body in a bag and transporting it. He said he had not had equipment with him at the scene to collect the fingerprint for analysis.

Agent Sipos testified that he and other investigators went to the Defendant's house after they left Jud Neal Loop, that they spoke with the Defendant, and that they searched the Defendant's white Sunfire. He said the Defendant showed him the mattress under which she had kept the $1000 she gave to the victim. He agreed that the Defendant had been cooperative.

Agent Sipos testified that he was present for the Defendant's interview at the Sheriff's Department. He agreed she was cooperative, although he thought she was evasive at times.

TBI Crime Laboratory employee Lucas Riley, an expert in latent print analysis, testified that he examined evidentiary items submitted in relation to this case. He found no identifiable latent prints on a Coke bottle and Mountain Dew bottle collected from the inside of the Defendant's car. Medical documents contained the victim's fingerprints and a palm print. He identified the Defendant's fingerprint on a cigarette pack from the car's center console. He identified one fingerprint from the car's visor as being from the Defendant's right little finger. His analysis of the remaining prints from the car were inconclusive or excluded the Defendant, Mr. Ealey, J.D. Ealey, and Dudley Todd Hudson. Mr. Riley said the victim's cell phone case contained two fingerprints but that the victim, the Defendant, Mr. Ealey, J.D. Ealey, and Mr. Hudson were excluded as their sources.

Greene County Property Assessor Chuck Jeffers testified that he prepared a map of the area around Jud Neal Loop, "Brittentown," and Brittentown Lane, which was received as an exhibit.

Gary Ealey testified that the victim had been his fiancée and that they had been together for eight months at the time of her death. He said they had shared a home with his father, C., and K. Mr. Ealey said he had been the father of the fetal victim.

Mr. Ealey testified that the victim was taking online phlebotomy courses, which she did at the Defendant's house or at McDonald's because they did not have Wi-Fi at their house.

Mr. Ealey testified that the victim took him to work at "Imerys Sheet Minerals" in their silver Acura on the morning of August 12, 2016. He said he stayed at work all day.

He said that he did not have a cell phone at the time and that the victim had one, but that it did not have "minutes." He said that when minutes were purchased, they were usually available immediately.

Mr. Ealey testified that the victim and the Defendant came to his place of employment at 3:00 p.m. on August 12, 2016. He said C. and K. were with them. He said they arrived in two cars: the car he shared with the victim and the Defendant's car. He said that he talked to them in the parking lot for about five minutes and that the Defendant offered him lunch money as he went back inside. He said this was unusual and explained that the Defendant had "helped" the victim in the past but had never offered money to him. He agreed that the Defendant frequently gave money to the victim. He said that he stood near the Defendant's car, on which the windows were open, and that he did not smell any strong odors. He said the victim left their car at his place of employment and rode away with the Defendant. He said the victim and the Defendant appeared to be "getting along."

Mr. Ealey testified that he had known the Defendant for five or six months at the time of the victim's death. He said he knew the Defendant through the victim and because the Defendant gave him rides to and from work once or twice. He said he had been to the Defendant's house once to drop off the victim's children.

Mr. Ealey agreed the Defendant usually babysat the children on weekends. He said that two weeks before the victim's death, he and the victim planned to take the children to Dollywood. He said that the Defendant came to their house "wanting to keep the boys," that the victim told the Defendant they were going to Dollywood with the victim's father, that the Defendant did not get to babysit the children for the weekend, and that he had no knowledge of the Defendant's becoming upset. Mr. Ealey said, however, that the victim and the Defendant "went a week or so without talking" and that the Defendant came to the house the weekend before the victim's death and wanted to babysit the children for the weekend. He said the Defendant was not allowed to take the children because he and the victim had planned to take the children swimming at Ms. Morrison's house. He said the Defendant seemed upset, put her hands on her hips, said, "Well, that's fine," and accelerated her car on gravel as she drove away. He said this was not the Defendant's typical mode of driving.

Mr. Ealey testified that his and the victim's relationship was "good" on August 12, 2016 and that they had not argued that day. He said he had given the victim money to pay bills that morning and assumed she had done so. He agreed that he "turned in" their car a few days after the victim's death and that back payments of $400 per month were owed for about two months. He agreed he finished work around 7:10 p.m. and said he went straight home, which took fifteen to twenty minutes. He said that he had expected the victim and her children to be home, that they were not, and that groceries were on the floor and stove. He said he did not see any grocery bags. He said he began working on a go-kart motor.

- 12 -

Mr. Ealey testified that the victim's father and sister came to the house around 7:35 to 7:40 p.m. to check on C. after his oral surgery. Mr, Ealey said the victim's father asked about C.'s whereabouts. Mr. Ealey said the victim's father and sister stayed about ten minutes and that while they were there, the victim's sister called the Defendant and asked about the victim's whereabouts. Mr. Ealey said Ms. Morrison arrived as it was getting dark, which he said was around 10:00 p.m., and inquired about the victim's whereabouts. He said Ms. Morrison tried to call the Defendant but did not receive an answer.

Mr. Ealey testified that he and Ms. Morrison went to the Defendant's house around 11:00 p.m. after Ms. Morrison was unable to reach the Defendant by telephone. He said that Ms. Morrison knocked on the Defendant's door and that they waited a couple of minutes without the door being answered. He said that he could hear noise inside and that after Ms. Morrison knocked, "everything got real quiet." He said that Ms. Morrison looked in the window and continued knocking, that children inside the house resumed making noise, and that the Defendant opened the door. He said they waited about three minutes for the Defendant to answer the door. He did not notice any bruises on the Defendant. He said Ms. Morrison asked about the victim. He said the Defendant stated that she bought groceries for the victim and the victim's children, that the Defendant gave money to the victim, and that the Defendant dropped off the victim. Mr. Ealey described the Defendant as "real defensive" and said she asked if he "had an issue with her keeping the boys." He said he told her that no one had an issue with her babysitting the children but that they sometimes had plans.

Mr. Ealey testified that he and Ms. Morrison left the Defendant's house, went to his house to call the Sheriff's Department about the victim's disappearance, and went to the Sheriff's Department to file a missing person's report. He said they were questioned by TBI agents and were informed that the victim was dead.

Mr. Ealey testified that before the victim's death, he expressed concern to the victim that the Defendant might try to take the victim's children "legally" because the Defendant was "just real overpowering when it come [sic] to them."

Mr. Ealey acknowledged that his father was "involved in" methamphetamine. Mr. Ealey said, however, "[I]t wasn't going on in my house. It definitely was not." Mr. Ealey agreed that his father recently "got caught with quite a bit of" methamphetamine.

Mr. Ealey testified that he had been married to Crystal Resendiz for the past three months. He agreed he assaulted her on July 7, 2017, but denied he "pushed and knocked her down and choked her." He denied holding her head underwater and breaking her cell phone. He said he had been falsely accused and had been acquitted of charges related to the July 7, 2017 incident.

- 13 -

TBI Special Agent Forensic Scientist Terra Asbury, an expert in forensic biology, testified that she tested items related to this case and issued written reports, which were received as exhibits. She said she processed the Defendant's white Pontiac Sunfire after it was brought to the TBI Crime Laboratory. She said she did not notice an odor in the car when she processed it.

Agent Asbury testified that reddish brown stains from the following locations tested presumptively positive for being human blood: exterior roof, front passenger seat, back of the passenger interior door handle, front passenger floorboard, interior passenger doorjamb, back floorboard behind the front passenger seat, driver's seat, console, crease of the console, and dashboard.

Regarding DNA analysis of samples collected from the car, Agent Asbury testified that a sample from the steering wheel contained a DNA mixture of at least three individuals, with at least one being male, and that further results were inconclusive. She said samples from the following locations contained human blood and a DNA profile that matched the victim's profile: front passenger seat, front passenger interior doorjamb, rear passenger floorboard, driver's seat, and passenger visor. Agent Asbury testified that she did not test additional samples from the car's interior to determine if they contained human blood or develop DNA profiles for them due to the number of identifications she made on other items containing human blood and a profile matching the victim's DNA. She acknowledged that she did not perform Y-STR DNA testing on samples from the steering wheel cover, emergency brake, and gearshift because the individuals for whom she had standards for comparison all had access to the Defendant's car. She acknowledged the possibility that "someone unknown to the car that didn't have access" could have left the male DNA in those locations. She said, as well, that she had been unable to perform Y-STR DNA testing on the steering wheel cover, emergency brake, and gearshift when it was later requested by the defense because all of the "blank" had been used in previous Y-STR testing on other samples.

Agent Asbury testified that a Coke bottle from the passenger floorboard contained a mixture of two DNA profiles, one of which matched the Defendant's profile, and the other being male but inconclusive as to further identification. Agent Asbury said the mouth area of a Mountain Dew bottle from the passenger floorboard contained a mixture of two DNA profiles, one of which matched the victim's profile, and at least one of which was male. She said further results for the contributor other than the victim were inconclusive. Agent Asbury said that a stain on the lid of the Mountain Dew bottle tested presumptively positive for blood and that further testing showed it contained a DNA profile which matched the victim's profile.

Agent Asbury testified that a sample from the victim's underwear consisting of sperm and nonsperm components. She said the nonsperm component contained a DNA profile which was consistent with the victim's profile. She said the sperm component

- 14 -

contained a mixture from at least two individuals, with the Y-STR DNA profile of one individual matching the profile of Mr. Ealey and J.D. Ealey, both of whom had the same Y-STR profile because they were father and son. She agreed that another profile existed in the sample, aside from the one which matched the Ealeys' profile. She said the other DNA profile from the sperm component was limited and deemed inconclusive. She acknowledged, however, that the DNA profile in the sperm component that she deemed inconclusive could have come from the victim if an incomplete separation of DNA occurred during the processing done in order to perform the analysis. Agent Asbury said she analyzed a vaginal swab of the victim's vagina and determined that it contained the Y-STR DNA of two males. She said the profile of one individual matched the Y-STR DNA profile of Mr. Ealey and J.D. Ealey. She was unable to identify the second male whose DNA was present.

Agent Asbury testified that a paper towel containing blood, which other evidence showed was recovered on Jud Neal Loop, tested presumptively positive for containing human blood and contained the DNA profile of an unknown female. She said the Defendant was excluded as the contributor of this DNA profile. Agent Asbury said that the victim's driver's license contained DNA profiles of at least two individuals, at least one of whom was male, and that Mr. Ealey, J.D. Ealey, William Smith, and Roger Smith were excluded as being a contributor. Agent Asbury said she did not analyze leaves found near the victim's body, samples from stains collected on the road, and the victim's clothing. She noted she performed over 400 tests related to this case and said she could not test everything because it was not "scientifically reasonable." She agreed that she did not test some stains in the Defendant's car or items in the car because, based upon her training, they did not appear to contain blood.

Agent Asbury testified that the victim's right-hand fingernail clippings tested presumptively positive for blood and contained a DNA mixture of at least three males, but further analysis proved inconclusive due to the limited size of the sample. She said getting another person's DNA under one's fingernails was "very easy." Referring to one of her reports, Agent Asbury said the victim's left-hand fingernail clippings contained a DNA mixture from at least two individuals, at least one of whom was male, and with one profile being consistent with the victim's DNA profile. She said the profile for the other contributor was inconclusive. Referring to another of her reports, she said that Y-STR DNA testing of the left-hand fingernail clippings revealed a profile consistent with at last three males. She said Mr. Ealey, J.D. Ealey, William Smith, Roger Smith, Dudley Hudson, C., and K. were excluded as having been the source of the major contributor profile and that the profiles for the minor contributors were inconclusive.

Retired Deputy Ricker was recalled and testified that the Defendant called and asked to meet with him on February 27, 2017. He said he met with the Defendant in a parking lot across from the jail and recorded their conversation. The recording was received as an exhibit and played for the jury. In the recording, the Defendant stated that she had to save

her grandson and that one day she would. She stated that if she "or that baby ends up hurt," she would not have talked to anyone but then-Deputy Ricker. The Defendant stated that Ms. Morrison was using drugs and made a "run" to Knoxville in December. She asked if a local drug task force existed, and then-Deputy Ricker stated he could connect her with the task force. She said that she needed to show him a photograph and "it was her and a man on this side of the table of her" at a bar and that the photograph was "as close as [she] could get." She said she wanted to know "who had my baby." She said that Ms. Morrison "took a run" to Texas within the last month but "that other boy lives in Texas."[3] The Defendant stated she wanted Ms. Morrison "arrested for this even if it's my last breath, and it's probably going to be." Then-Deputy Ricker asked the Defendant if she thought Ms. Morrison had been involved in the victim's death, and the Defendant said she "can't talk" and would rely on law enforcement because they knew what they were doing. The Defendant said she had to "fight to keep that baby alive." The Defendant made reference to a time she thought law enforcement was coming to tell her "they had killed that baby." She said she and her son, William, had not been able to see the baby. She said that she did not know how the victim had been killed but that if she had been shot, he should obtain "the records from our first court thing." She said Ms. Morrison had testified in a prior proceeding that "that baby told her that Daddy shot Momma." The Defendant said the baby did not know that William was his father. She said she had received information from two people who were close to Ms. Morrison's drug activity. She said that she wanted to talk to someone about Ms. Morrison's drug activity and that "there's nothing worse than a scorned woman." The Defendant said she thought Ms. Morrison sold "the big stuff." Apparently referring to custody proceedings that she did not explain, the Defendant said "that gross man settled" and "got his kid," threatened the victim by telephone, and fought with Mr. Ealey.

Mr. Ricker identified photographs taken at Jud Neal Loop, which were received as exhibits. He agreed that to the best of his recollection, the Defendant's car had been unlocked when she allowed the officers to search it at her house. He agreed that when he and other officers went to the Defendant's house in the hours after the victim's body was found, the Defendant never asked what happened to the victim after they told the Defendant that the victim was dead.

Greene County Sheriff's Detective Michelle Holt testified that she had been at the Sheriff's Department when Ms. Morrison and Mr. Ealey came to file a missing person's report regarding the victim and when the Defendant was interviewed. Detective Holt said she was later assigned to investigate the case.

---

[3] Other evidence showed that K.'s father lived in Texas.

Detective Holt testified that while she spoke to family members of an unrelated missing person on August 12, 2016, the Sheriff's Department received a call regarding the body of a woman found on Jud Neal Loop. Detective Holt said she obtained information about the victim's tattoos from Ms. Morrison, which officers on the scene used to identify the body as that of the victim. Detective Holt said she interviewed Mr. Ealey, while Detective Morgan interviewed Ms. Morrison. Detective Holt said she was present for the Defendant's interview.

Detective Holt testified that she participated in making a video recording of the "North Greene and Brittontown Road area," and the recording was played for the jury and described by the witness. Referring to a map, Detective Holt indicated the distance between points of interest relevant to this case. She said that the victim's body was found two and one-half miles from the Defendant's house and that items of interest were found two miles from the victim's body. Detective Holt said that the video showed the drive from the victim's house to the Defendant's house and that the distance between the two locations was 4.9 miles and was a eight minute, fifty-two second drive.

Martina Schmidt, M.D., an expert in forensic pathology, testified that the victim had been twenty-one years old and pregnant at the time of death. Dr. Schmidt said the fetus had been approximately sixteen weeks and had died as a result of the victim's death. Dr. Schmidt said she determined that the victim's death was a result of multiple blunt force injuries to the head, which included contusions, lacerations, and skull fractures. Dr. Schmidt said the victim had a fracture at the base of the skull, soft tissue injuries to her hands, abrasions and contusions to the chest and back, and a right hand ring finger fracture. Dr. Schmidt classified the victim's manner of death as homicide. Dr. Schmidt said that the victim's toxicology analysis showed no alcohol, drugs, or nicotine, and that the victim had no signs of trauma to her vulva. Dr. Schmidt identified photographs of the victim's injuries, which were received as exhibits. Dr. Schmidt said that a piece of gauze had been placed on the victim's side at the site of what appeared to be a bloody fingerprint but that the gauze absorbed the blood and removed the evidence from the victim's body. Dr. Schmidt said no paternity testing was done regarding the fetus.

Peggy Carter, the Defendant's sister-in-law, testified for the defense that the Defendant and the Defendant's husband, who was Ms. Carter's brother, had been at Ms. Carter's house the weekend before the victim's death. Ms. Carter said her husband had also been present. Ms. Carter said she saw her cat leave the inside of the Defendant and the Defendant's husband's car through an open window. Ms. Carter said she told them that the cat had "probably sprayed" the car. She said the cat had done this on other occasions. She said that she later had a conversation with the Defendant's husband about removing the smell out of the car and that she told him to try using bleach.

Ms. Carter testified that when she visited the Defendant's house, C., K., and E. were there frequently. Ms. Carter said the Defendant loved children and was a good grandmother.

Roger Carter, the Defendant's brother-in-law, testified that the Defendant and her husband visited Mr. Carter and his wife on the weekend before the victim died. Mr. Carter said he saw one of his cats come out of the Defendant's white Sunbird through an open window. He said the cat had been inside his truck on another occasion.

Mr. Carter testified that the Defendant babysat the victim's children and that he had seen them when he visited the Defendant's house. He agreed that he was familiar with the Defendant's house and that the Defendant and her husband also had a cat and a German Shepherd dog.

Linda Jones testified that she had worked with the Defendant for about twenty-five years. Ms. Jones said the Defendant was an insurance clerk at Laughlin Hospital. Ms. Jones recalled that the victim had been at the hospital with the victim's two children on the day the victim died. Ms. Jones said that the victim and the Defendant had talked in the lobby and that the victim and the Defendant did not appear to have any "problem in the relationship."

Edward Hitchens testified that in August 2016, he was moving his belongings into a house in the victim's neighborhood when he had a conversation with a female next-door neighbor about purchasing a go-kart outside her house. He said the woman went inside her house after the conversation. He said this occurred about 5:00 or 5:30 p.m. and that he later saw an older, white minivan outside with two men inside. He said he later learned the female neighbor with whom he had spoken had died and was the victim. He said he did not remember telling Detective Michelle Holt that the victim had not been home when he saw the white van outside the victim's house.

Jason Matthews testified that he lived on Baileyton Road near the victim's neighborhood. He said that on a Friday in August 2016, he saw the victim arrive in a car around 5:00 p.m. and get into an old, shiny white van about thirty minutes later. He later said that the victim got into the van around 3:30, 4:00, or 5:00 p.m. and that he was uncertain of the time. He said he did not see who else was in the van but thought the person was a man. He said he had never seen the Defendant. Mr. Matthews acknowledged that he had memory problems and had difficulty hearing and understanding people. Mr. Matthews identified a photograph taken from near his porch showing the area in which he had seen the victim get into the van, and the photograph was received as an exhibit.

Sharon Burgner testified that E. was her granddaughter. Ms. Burgner said she knew the Defendant as E.'s other grandmother. Ms. Burgner said she had been at her house on the evening of August 12, 2016, around 7:00 p.m., when the Defendant arrived to pick up

E.  Ms. Burgner said her house was about twenty miles from the Defendant's house and that the drive took about forty minutes, although she was a slow driver.  Ms. Burgner said that she went outside to speak to the Defendant and give the Defendant tomatoes and that the Defendant smoked and stood outside the Defendant's car.  Ms. Burgner said the Defendant wore a white sleeveless shirt but did not recall the details of the Defendant's pants.  Ms. Burgner did not see any injuries on the Defendant.  When shown a still photograph of the Defendant from the Food City surveillance footage, Ms. Burgner said the Defendant had not worn the same shirt at Ms. Burgner's house that evening as she wore in the photograph.

Ms. Burgner testified that she had been on both sides of the Defendant's car and that she had seen inside the car that evening.  When shown a photograph of the inside of the Defendant's car, Ms. Burgner said the car had not had the stains shown in the photograph when Ms. Burgner saw the car's interior on August 12.  Ms. Burgner said that she and the Defendant discussed a cat's having urinated in the car earlier that day at "Aunt Peg's" and that E. retrieved a towel upon which to sit in the car.  Ms. Burgner identified Aunt Peg as "Rod's sister."  Ms. Burgner said the Defendant did not say anything about cleaning the car with bleach that day or having a wet seat.  Ms. Burgner said she would not have let E. get into the car if Ms. Burgner had seen blood stains.

Ms. Burgner testified that E. typically called the Defendant repeatedly on Friday afternoons before the Defendant arrived to pick up E.  Ms. Burgner described E. as "persistent."  Ms. Burgner did not know if E. "reached" the Defendant on August 12, 2016.

The Defendant elected not to testify.

Jason Matthews was recalled on rebuttal and testified that he thought he saw the victim get into the white van but that he "wasn't sure it wasn't."  He said she got into the van quickly.  He said he did not see the woman's face but saw long hair.  He was sure he saw a woman get into the van.

J.D. Ealey testified that he had been with his friend Dudley Hudson all day and evening on August 12, 2016.  He said they had been in Mr. Hudson's white van.  He said that he went to the house he shared with the victim and Mr. Ealey around 3:30 or 4:00 p.m. to drop off some purchases and that no one was home.  He said groceries were "thrown on the counter," which was not typically how they were stored in the household.  He said that he and Mr. Hudson left after about thirty minutes and that the victim did not come home in the time he was there.  When asked if he recalled giving a statement to law enforcement that he had arrived home around 4:30 or 5:00 p.m., J.D. Ealey said he might have arrived home later than he had stated previously and said he had not known the time.

J.D. Ealey testified that the victim had been a good person and that she did not use drugs.  He said that during the time he lived with the victim and Mr. Ealey, the victim

stayed home with her children. J.D. Ealey said she stayed home "most of the time" in the evening. He said that he never witnessed domestic violence between the victim and Mr. Ealey and that they did not allow "drug activity" in the house. J.D. Ealey said he did not know the Defendant. J.D. Ealey said another son, Donovan, had a brown and white Ford Econoline van. J.D. Ealey said Mr. Hudson had not known the victim. J.D. Ealey said he did not know of anyone with whom the victim had "problems."

When asked about drug activity and weapon possession occurring on December 22, 2017, J.D. Ealey asserted his Fifth Amendment privilege against self-incrimination. He denied that he had been involved in the "meth trade" when he lived with the victim and Mr. Ealey. J.D. Ealey said he did not use methamphetamine on August 12, 2016.

After receiving the evidence, the jury found the Defendant guilty of first degree premeditated murder of the victim. The jury found the Defendant not guilty of first degree premeditated murder of the victim's fetus but guilty of the lesser included offense of second degree murder of the fetus. The trial court sentenced the Defendant to life for the first degree murder conviction and to twenty-five years as a Range I offender for second degree murder. The court imposed the sentences concurrently. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her convictions. In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2018), 39-13-202(a)(1) (2018). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2019) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Factors from which a jury may infer premeditation include:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

*State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

Second degree murder is a "knowing killing of another." T.C.A. § 39-13-210. "'[A]nother' and 'another person' include a human embryo or fetus at any stage of

gestation in utero, when any such term refers to the victim of any act made criminal by this part." *Id.* § 39-13-214.

The Defendant argues that the evidence does not support her convictions and, instead, shows that the victim was killed by an unknown person or person and that the fetal victim likewise died as a result of the action of this unknown person or persons. The Defendant points to DNA which was found under the victim's fingernails and to various unidentified fingerprints found on the physical evidence. The Defendant argues that the evidence shows, at most, that her car was used to transport the victim's body and not that the Defendant perpetrated the fatal beating that killed the victim and the fetal victim. The Defendant argues, as well, that the State presented no evidence she was injured, despite the evidence of a violent attack against which the victim fought for her life. The Defendant argues that the evidence showed she loved the victim and that it failed to establish premeditation. Essentially, the Defendant asks this court to reweigh the evidence. This we cannot do. Questions regarding the credibility of the witnesses and the weight and value to be afforded to the evidence are reserved for the jury as the trier of fact. *Bland*, 958 S.W.2d at 659; *see Sheffield*, 676 S.W.2d 547.

As we have stated, this court must review the evidence in the light most favorable to the State in assessing the sufficiency of the evidence. Viewed in that light, the evidence shows that the Defendant cultivated a relationship with the victim in order to gain access to the victim's children, one of whom was the Defendant's biological grandchild. The Defendant provided groceries, money, and babysitting to the victim. The Defendant had not been allowed to babysit C. and K. for the two weekends before the crimes because the victim and Mr. Ealey had other plans that involved the children, which had upset the Defendant. The Defendant stated in a pretrial statement that she had been supposed to babysit C. and K. on the weekend of the crimes but that the victim sent the Defendant a text message stating the victim was going to keep the children at home. Ms. Morrison testified that she had planned to spend the night of August 12, 2016, at the victim's house to help with C., who had just had oral surgery. According to her pretrial statement, the Defendant believed that Mr. Ealey did not want the Defendant to spend time with the children, one of whom was fathered by the Defendant's son. The Defendant and the victim were seen together in the hours before the victim's badly beaten body was found. They were in the Defendant's car together that afternoon, and hours later, stains which were later determined to be the victim's blood were found in several locations in the car, notwithstanding the Defendant's claim that the stains had been in the car when she purchased it. Circular patterns were found which were consistent with efforts to clean the blood from the windshield and window on the front passenger side. The evidence showed that the victim sustained a brutal attack consisting of a prolonged assault involving multiple blunt force blows before her death. It likewise shows that the Defendant changed her shirt between her trip to Food City with the victim and her trip to pick up E. at Ms. Burgner's house and that the Defendant gave inconsistent accounts of the time she spent with the victim shortly before the victim's death. The evidence supports conclusions that the

Defendant disposed of the victim's body and other evidence of the crimes in remote locations. The Defendant acknowledged in her pretrial statement that she was aware of the victim's pregnancy.

From this evidence, a rational jury could conclude that the Defendant perpetrated an intentional and premeditated killing of the victim. Likewise, it could conclude that the Defendant knew her actions in fatally assaulting the victim would lead to the death of the fetal victim. The Defendant is not entitled to relief on this basis.

## II

### Denial of Motion to Dismiss for Failure to Disclose Exculpatory Information

The Defendant contends that the trial court erred in denying her motion to dismiss based upon the State's failure to disclose information regarding a law enforcement "ping" of the victim's cell phone. She argues that the failure to disclose this information violated *Brady v. Maryland*, 373 U.S. 83 (1963), and that dismissal was the appropriate remedy due to the State's failure to preserve the evidence, pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). The State counters that the trial court did not err in denying the motion to dismiss and, instead, instructing the jury that it could infer the lost evidence was favorable to the defense. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

In order to show a due process violation for failure to provide evidence pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

With regard to the question of the State's duty to preserve discoverable evidence, our supreme court has held that the State has a duty to preserve such evidence when the evidence

might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Ferguson*, 2 S.W.3d at 917 (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)); *see* Tenn. R. Crim. P. 16 (discoverable evidence); *see also State v. Merriman*, 410 S.W.3d 770, 779 (Tenn. 2013). The supreme court has said that the proper inquiry involves, first, determination of whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. This duty to preserve applies to "potentially exculpatory" evidence. *Merriman*, 410 S.W.3d at 793 (citing *Ferguson*, 2 S.W.3d at 917). If the State failed to fulfill the duty, three factors must be considered:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* The supreme court has said that in evaluating these factors:

[T]he central objective is to protect the defendant's right to a fundamentally fair trial. If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges. Dismissal is, however, but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction.

*Id.* A trial court's application of the *Ferguson* factors involves a constitutional issue, and our supreme court has concluded that the proper standard of review on appeal concerning the fundamental fairness of a trial is de novo. *Merriman*, 410 S.W.3d at 791. We review a trial court's selection of the remedy applied to a *Ferguson* violation for abuse of discretion. *Id.* at 792.

During former Detective Randolph's direct examination testimony, the prosecutor asked what happened after the Defendant's interview at the Sheriff's Department. Mr. Randolph responded, "After that interview, the next morning, I think we got done about 6

o'clock, 4:30 or something. Anyway, Steve Ratledge pinged the cell phone of [the victim's] upon –." Defense counsel objected, and the trial court sustained the objection. Thereafter, Mr. Randolph testified that officers went to Tyne Gray Road to see if any residents in the area had seen anything unusual the previous night and that he found a pair of child's shorts, a diaper, and paperwork related to the procedure C. had on August 12, 2016, about three-fourths of one mile from Tyne Gray Road. He said he also found the victim's cell phone cover in three pieces and C.'s medical wristband on Babbs Mill Road, which other evidence showed was in the same general area. He said, as well, that he found one half of the victim's driver's license on Betsy Ross Road, which was nearby.

After Mr. Randolph's testimony, defense counsel advised the trial court that the information about pinging the victim's cell phone had not been provided to the defense during discovery. Counsel characterized the evidence as "potentially exculpatory." One of the prosecutors stated that he had been aware of the fact that the police had pinged the cell phone but, "I was not aware that they did not verbally know it."

In a jury-out hearing, Detective Ratledge testified that in the early morning hours of August 13, 2016, he pinged two cell phone numbers associated with the victim using a "location based service" provided by the jail's Securis telephone system. He said the system "can come back with a location on a ping from the phone which is based on triangulation, based on how many towers it hits and their estimate of where the phone is. It is not exact but it will put you in an area." He said that one of the numbers showed a location on Tyne Gray Road. He said he printed a document containing information related to the ping, gave it to Detective Randolph, and kept a copy. He said that he pinged this cell phone number again around 11:00 a.m. on August 15 but that he did not obtain any location information. He said he pinged a second number associated with the victim in the early morning hours of August 13 and that it showed a location in the Jockey Road area "around Rheatown in Greene County," which he said was a distance away, near Washington County. He said that no cell phone was found in the Tyne Gray Road area.

The following day, the trial court conducted another jury-out hearing regarding the matter. At this point, the defense had filed a motion to dismiss due to lost evidence and a *Brady* violation. The defense argued that the State's nondisclosure of the evidence had deprived it of the opportunity to investigate, to speak with witnesses who lived in the area where the cell phone had pinged, and to consult an expert regarding cell phone location data. Defense counsel also argued that the State no longer had the document showing the information about the ping and that its failure to preserve the evidence amounted to gross negligence under *Ferguson*. Counsel noted that the victim's cell phone case had been found in another location, that it had unidentified fingerprints on it, that the victim had DNA of unidentified men under her fingernails and semen from two individuals in her panties and vagina, that a paper towel with blood containing the DNA of an unknown woman was found near the victim's body, and that the State's case consisted of circumstantial evidence.

One of the prosecutors acknowledged that he had known about the ping and had thought the information "had come up" in discussions with the defense. The prosecutor said he had never seen a document related to the ping and had learned about it from Mr. Randolph when preparing the case for trial "fairly recently." The prosecutor said the officers involved in the case had searched and continued to search for the documentary evidence related to the ping but had been unable to find it. The prosecutor stated there had never been an intent to hide information from the defense.

The prosecutor noted that in the Defendant's statement at the Sheriff's Department, she had been asked if she knew the location of Tyne Gray Road and had asked if the police had pictures from this location. In the interview, Mr. Randolph had responded, "No, it's a tracking thing," and had asked if the Defendant knew if the victim knew anyone who lived on Tyne Gray Road. Defense counsel responded that, although this information made sense once the context was provided at the trial by the information that a cell phone ping had taken place, that information had not been available to the defense in preparing for the trial.

The trial court denied the Defendant's motion to dismiss but granted the alternative relief that the defense had requested: a jury instruction in accord with Tennessee Pattern Instruction – Criminal 42.23, which permits an inference that evidence which the State had a duty to preserve but failed to preserve would be favorable to the defense. In considering the appropriate remedy, the court found that the evidence was material in the constitutional sense and that it was of such a nature that the defense would be unable to obtain comparable evidence by reasonably available means. The court also found that the State failed to fulfill the duty to preserve the evidence and that the State was negligent and "probably" grossly negligent in its failure. Regarding the significance of the lost evidence in light of its probative value and reliability, the court found that the accuracy of the evidence was not high. The court found, as well, that the record contained other proof from which the jury might find sufficient evidence to convict the Defendant, noting particularly the evidence regarding the time frame when the Defendant and the victim left Food City together through the time when Mr. Conn discovered the victim's body and the defendant's explanations regarding the return and cleaning of her car.

Later in the trial, one of the prosecutors notified the trial court that it had the records from the Securis system regarding the cell phone ping,[4] and the document containing the records was marked as an exhibit.

As part of its charge, the trial court instructed the jury as follows:

---

[4] It appears from the record that the document may have been generated by the Securis system as a result of the defense's motion and the State's subsequent search for the original document, rather than that the document provided by the State at this point having been the original, lost document.

- 26 -

The state has a duty to gather, preserve and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The state has no duty to gather or indefinitely preserve evidence considered by a qualified person to have exculpatory value [sic], so that an as-yet-unknown defendant may later examine the evidence.

The Greene County Sheriff's Department pinged the cell phone of Jessie Morrison on August the 13th, 2016, at 4:34 a.m., revealing the phone's location to be at 1254 Tyne Gray Road. Documentation of this information was lost by the state.

If, after considering all of the proof, you find that the state failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

At the motion for a new trial, one of the prosecutors advised the trial court that the prosecution team learned about the cell phone ping evidence "a few weeks before" the trial. The prosecutor again conceded that the State failed to provide the information to the defense. The prosecutor said that, had the document not been lost, the earliest it could have been provided to the defense was seven to eight months after the offense, which was when the indictment was returned.

In denying the motion for a new trial, the trial court found that it gave an appropriate instruction regarding the lost evidence and the jury's ability to infer that the evidence was favorable to the defense. The court found that the defense had requested the remedy it provided.

We begin our analysis with the *Brady* issue. The record reflects that the defense made a discovery request and that the State had an "open file policy" regarding discovery. The record likewise shows that the prosecutors and defense counsel discussed the evidence before the trial. The State does not dispute that it failed to provide the Securis records regarding the cell phone ping.

Regarding the question of whether the evidence was favorable to the defense, the record shows that the police were able to obtain an approximate location of the victim's cell phone in a different location from, but same general area as, where a piece of the victim's driver's license, the victim's cell phone case, and paperwork related to C.'s surgery were found. The Defendant was, by the time the ping information was known, at

the Sheriff's Department, and the victim's cell phone was never found in the subsequent investigation. The Defendant notes that the State's evidence did not include identification of the location where the victim was killed and that the evidence showed unidentified male DNA from more than one individual under the victim's fingernails and in her vagina. The Defendant, notes, as well, the presence of a mixture of sperm on her panties, unidentified male DNA on her driver's license, blood of an unidentified female on a paper towel near where the victim's body was found, and two unidentified latent fingerprints on the victim's cell phone case. The defense argues that the victim's cell phone was likely taken by the perpetrator and that prompt disclosure of the information would have allowed the defense to obtain a cell phone data location expert, identify individuals associated with the address identified by the cell phone ping, and interview residents of the area. The defense argues, as well, that it was prevented from cross-examining at least three unidentified officers about their investigative efforts, if any, relative to the cell phone ping information. Despite the defense's conjecture regarding what prompt disclosure of the evidence might have yielded, the evidence itself is not favorable in the sense that the location of the cell phone ping suggests that someone other than the Defendant committed the crimes. Further, the evidence shows that other personal effects of the victim were found in the same general area as the cell phone ping. This information was available to the defense before the trial and could have provided the basis for investigation of residents or other additional evidence in the area. Although the Defendant argues that timely disclosure of the cell phone ping evidence would have permitted her to retain a cell phone data expert, she has not identified what evidence such an expert might offer and how it might be favorable to the defense.

Even aside from the lack of a showing that the evidence was favorable, the evidence was not material because the record does not support a determination that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Johnson*, 38 S.W.3d at 58; *Edgin*, 902 S.W.2d at 390. The Defendant had the burden to show a *Brady* violation by a preponderance of the evidence. *See Edgin*, 902 S.W.2d at 389. As we have stated, the evidence merely shows that the victim's cell phone pinged its location near the area where some of the victim's personal effects were found. It does not provide any information which identifies unknown depositors of DNA or semen on the victim's person, the depositor of unknown DNA on the victim's cell phone cover, or of the source of the blood on the paper towel found in another location. The location identified by the cell phone ping also does not, standing alone, suggest that someone other than the Defendant committed the crimes. The Defendant offered no evidence at the motion for a new trial to show that disclosure of this evidence would have led to the discovery of exculpatory information. The Defendant failed to show that the cell phone ping evidence was favorable or material to the defense. Thus, the trial court did not err in denying the motion to dismiss on the basis of a *Brady* violation.

Thus, we turn to the *Ferguson* issue. As our supreme court has noted, *Brady* dealt with prosecutorial suppression of "plainly exculpatory" evidence, and *Ferguson* involved the destruction of evidence, the character of which may never be known. *See Ferguson*, 2

S.W.3d at 915. Although the information about the approximate location of the victim's cell phone, as indicated by the ping, is not in itself exculpatory, it had the potential to provide exculpatory evidence through further investigation. *See Merriman*, 410 S.W.3d at 784. Thus, the State had a duty to preserve the evidence. As we have stated, the trial court found that the State was negligent, and "probably" grossly negligent, in failing to preserve the evidence. The court found that the accuracy of the evidence in identifying the cell phone's location was not high, implicitly determining that the significance of the evidence was limited. The court also determined that the State had presented other, sufficient evidence upon which the jury might find that the Defendant had committed the charged offenses.

Upon review, we conclude that the trial court did not abuse its discretion in declining to dismiss the charges. Although the defense was unaware until during the trial that the cell phone ping placed the victim's cell phone at an approximate location on Tyne Gray Road, it knew from discovery information that other items related to the victim were found nearby. Thus, the defense knew that investigation of the area might be an avenue for locating relevant evidence. The jury instruction the court provided was in accord with the pattern instruction, and it was an appropriate and sufficient remedy to protect the Defendant's right to due process in this case. The Defendant is not entitled to relief on this basis.

## III

### Due Process Violation

The Defendant contends that the State violated "the spirit of *Brady*" and her due process rights by failing to provide a pretrial statement of defense witness Jason Matthews as part of discovery. The State responds that the Defendant has not shown that she is entitled to relief. We agree with the State.

The record reflects that Mr. Matthews gave two pretrial statements. In the first, which was provided to the defense during discovery, he stated that on the day of the victim's death, he saw the victim get into a white van shortly before a white Pontiac car drove away. In the second, which was not provided to the defense before the trial, he stated he saw a white car drive into the victim's neighborhood and then drive away. "A little while later," he saw a white van drive into the victim's neighborhood. He said that he previously told Detective Ricker he had seen the victim get into the van but that he was unsure who the person had been.

The defense called Mr. Matthews as a witness at the trial, and defense counsel stated at the hearing on the motion for a new trial that he had interviewed Mr. Matthews "a couple of times" before the trial and that he called Mr. Matthews as a defense witness without knowledge of the second statement. Counsel stated that he had received the second

statement after Mr. Matthews testified as a defense witness and that counsel did not raise a *Brady* violation issue at the time because he initially viewed the disclosure as *Jencks* material. *See Jencks v. United States*, 353 U.S. 657 (1957); Tenn. R. Crim. P. 26.2(a). The record reflects that the State recalled Mr. Matthews in rebuttal. Before the rebuttal testimony, the court held a jury-out hearing, at which the prosecutor read Mr. Matthews's second statement to him in order to refresh his recollection. The record shows that Mr. Matthews was unable to read and was hard of hearing. After his recollection was refreshed, Mr. Matthews testified that he had seen "a girl" with long hair get into a white van and that he thought but did not know if the girl had been the victim.

Defense counsel stated at the hearing on the motion for a new trial that after the trial, he analyzed the State's nondisclosure of the witness's second statement as a *Brady* claim, which he raised for the first time in the motion for a new trial. Counsel acknowledged that the statement was not favorable to the defense but argued that its nondisclosure "violates the spirit of *Brady*." The prosecutor stated at the hearing that the State's records showed an unsuccessful attempt to fax the second statement to the defense before the trial. The prosecutor stated, "We actually thought they had received it. There had been no paid attention [sic] to the error. It was stuck in the fax machine, we think it's gone through and we've gone about our business. There was no intent ever to sabotage [defense counsel] as it related to that second statement of Mr. Matthews." The trial court found that the second statement was not *Brady* material because it was not favorable to the defense.

On appeal, the Defendant argues that the State's nondisclosure of the second statement violated the "spirit" of *Brady* and deprived her of her right to due process. She argues that she was prejudiced by the mistaken belief that Mr. Matthews was a favorable defense witness, having presented his testimony and then having been "ambushed" by the State's impeachment of him with the second statement. She claims that this prevented her from intelligently exercising her right to present a defense.

As the trial court found and as the defense conceded at the hearing on the motion for a new trial, the defense cannot establish a *Brady* violation because Mr. Matthews's second statement was not exculpatory to the Defendant. *See Edgin*, 902 S.W.2d at 389. As regards the due process argument, the record fails to show that the Defendant was prevented from presenting a defense, including calling favorable witnesses. *See Washington v. Texas*, 388 U.S. 14, 19 (1976) (holding that a defendant has the right to present a defense and call witnesses on her behalf as a fundamental right of due process of law). Rather, the record reflects that, notwithstanding the State's failed attempt to provide Mr. Matthews's second statement to the defense before the trial, the defense was able to interview Mr. Matthews and make an informed decision as to his credibility and value as a defense witness. The Defendant has not shown that she was not afforded her right to due process, and the court did not err in denying relief on this basis.

# IV

## Trial Court Improperly Commented on the Evidence

The Defendant contends that the trial court improperly commented on the evidence during Mr. Matthews's rebuttal testimony, in violation of Tennessee Constitution Article VI, section 9. She acknowledges that she did not object contemporaneously but asks this court to grant relief as a matter of plain error. The State responds that the Defendant is not entitled to relief because the record reflects that the court's comment was made to preserve the record and was not improper. We conclude that the Defendant has not shown she is entitled to plain error relief.

As we have stated, Mr. Matthews was hard of hearing. The record reflects that he had great difficulty in understanding and answering questions when he was on the witness stand. His testimony during the Defendant's case-in-chief and the State's rebuttal was imprecise and, at times, inconsistent. In addition, the record reflects multiple references to his being anxious or nervous about having to testify. During the defense's cross-examination of Mr. Matthews during the State's rebuttal evidence, the prosecutor objected to a defense question as "leading." The following transpired:

> [PROSECUTOR]: Your Honor, that, is certainly not my witness. That was leading.
>
> THE COURT: What?
>
> [PROSECUTOR]: That was leading. It's his witness.
>
> [DEFENSE COUNSEL]: I'm cross-examining the witness.
>
> THE COURT: He's cross-examining the witness you called on rebuttal. You called him on rebuttal.
>
> [DEFENSE COUNSEL]: May I ask?
>
> THE COURT: But I think the jury has heard this and they're shaking their head yeah, they've heard him testify and they're shaking their heads. What do you want to ask him? What else?
>
> [DEFENSE COUNSEL]: I want to give him an opportunity to explain his statements.

The court permitted defense counsel to resume questioning the witness.

- 31 -

At the hearing on the motion for a new trial, the defense challenged the trial court's statement that the jury was shaking its head as an improper comment on the evidence. In support of this allegation, the defense offered an audio recording of the relevant proceedings.

On appeal, the Defendant argues that the audio recording shows that the trial judge laughed and that his tone conveyed that he was dismissive and skeptical of Mr. Matthews's testimony. Tennessee Constitution Article VI, section 9 provides, "The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." Our supreme court has interpreted this provision to mean that a trial court is prohibited from commenting upon the credibility of witnesses or the evidence. *See State v. Suttles*, 767 S.W.2d 403, 407 (Tenn. 1989). However, our supreme court has also cautioned that not every comment on the evidence made by a judge provides a basis for a new trial. *See State v. Hester*, 324 S.W.3d 1, 89 (Tenn. 2010). Rather, the reviewing court must evaluate the comments in the overall context of the case in assessing whether they were prejudicial to the defense. *Id.*

As the Defendant concedes, she did not object contemporaneously. *See* T.R.A.P. 36. Thus, our review is limited to one for plain error.

In that regard, five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018). All five factors must exist in order for plain error to be recognized. *Smith*, 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

The record, including the audio recording, reflect that the trial court inquired about further questioning of Mr. Matthews after he was subject to thorough examination and cross-examination during the Defendant's case-in-chief and his further examination and

cross-examination during the State's rebuttal evidence. The record reflects that Mr. Matthews appeared not to hear or understand the questions at times and that counsel for both parties asked him repetitive questions about what he had seen on the day of the victim's death and, specifically, about whether he saw the victim get into the white van. A trial court has the right to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Tenn. R. Evid. 611(a). The record reflects that after defense counsel answered the court's query, counsel was permitted to continue his cross-examination of the witness. In addition, the record reflects that Mr. Matthews's testimony was both equivocal and contradictory and that the court's comment was directed at ascertaining how much further counsel intended to go with repetitive questioning. We do not view the court's tone as dismissive of Mr. Matthews's credibility. The court's comment had little to no significance in light of an overview of Mr. Matthews's testimony and the case as a whole. The record reflects, as well, that the court properly instructed the jury as to its duties in assessing witness credibility and weighing the evidence. Our review of the court's comments in the overall context of the case leads us to conclude that the Defendant has failed to show that the court's comments breached a clear and unequivocal rule of law, that a substantial right was adversely affected, or that consideration of the issue is necessary to do substantial justice. Therefore, the Defendant cannot prevail in her request for plain error relief.

V

**Cumulative Trial Errors**

The Defendant contends that she is entitled to relief based upon cumulative trial errors. The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76–77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)). Upon consideration of the errors alleged, we conclude that the Defendant received a fair trial and that cumulative error relief is not appropriate.

VI

**Sentencing for Second Degree Murder**

The Defendant contends that the trial court erred in sentencing her to a maximum, twenty-five-year term for second degree murder. She argues that the court erroneously applied two enhancement factors and failed to apply a mitigating factor and that the court

should have imposed a minimum, fifteen-year sentence. The State counters that the Defendant has not shown that the court abused its discretion. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

At the sentencing hearing, Angie Maupin testified that she and the Defendant attended high school together and had worked together at Lauglin Hospital for twenty-eight to twenty-nine years. Ms. Maupin described the Defendant as a hard worker and a good person who always took care of the hospital's patients who needed extra assistance. Ms. Maupin said the Defendant had babysat for Ms. Maupin.

Jessica Price, a coworker of the Defendant's for thirteen years, testified that everyone at the hospital loved the Defendant, whom Ms. Price described as "good" to everyone.

Mary Ann Blair testified that she knew the Defendant through Ms. Blair's involvement with the Greene County jail ministry. Ms. Blair said that the Defendant participated in weekly Bible study meetings, that the Defendant was knowledgeable about the Bible, and that other inmates looked up to the Defendant. Ms. Blair said the Defendant was kind to the other inmates, took care of them, and prayed with them.

The presentence report was received as an exhibit and reflected the following: The fifty-two-year-old Defendant had two convictions in 1993 for misdemeanor writing worthless checks. The Defendant was a high school graduate with a continuous employment history from the time she graduated from high school until her arrest. The Defendant was married with two children, a stepchild, and three grandchildren. She reported good mental and physical health and that she had not used alcohol or non-prescribed or illegal drugs since 1984. Ms. Morrison completed a victim impact statement which detailed the effect of the Defendant's crimes on the victim's family.

The trial court rejected the Defendant's proffered mitigating factor that, although guilty of the crime, she committed the crime under such unusual circumstances that it was unlikely that she had been motivated by a sustained intent to violate the law. *See* T.C.A. § 40-35-113(11) ("The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct."). The court noted that the Defendant maintained her innocence and found that the crime was not committed under any unusual circumstances. The court rejected the proffered mitigating factor that the Defendant lacked a criminal record, noting the Defendant's prior convictions for writing worthless checks. The court afforded mitigating weight to the Defendant's favorable work history and having lived a productive life until committing the present offenses. *See id.* at (13) ("Any other factor consistent with the purposes of this chapter").

Regarding enhancement factors, the trial court found that the victim was particularly vulnerable due to age, noting that the victim of the second degree murder was a fetus. *See id.* § 40-35-114(4) ("A victim of the offense was particularly vulnerable because of age or physical or mental disability."). The court found that based upon the circumstantial evidence, the Defendant possessed a deadly weapon at the time of the offense, noting the nature and extent of the injuries to the victim, which included severe skull lacerations and a fractured skull that would have been caused by the victim's having been "hit with something." *See id.* at (9) ("The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense."). The court found, as well, that enhancement was warranted because the Defendant abused a position of private trust. *See id.* at (14) ("The defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense."). The court noted that the victim, who was pregnant, demonstrated her trust in the Defendant by riding with the Defendant and permitting C. and K. to ride with the Defendant in the hours preceding the homicides and that "bad things happened, this murder happened after that."

In balancing the mitigating and enhancement factors, the trial court weighed the enhancement factors heavily and concluded that the appropriate sentence for second degree murder was twenty-five years. The court imposed the sentence concurrently to the Defendant's life sentence for first degree murder.

The Defendant argues that the trial court should have found as a mitigating factor that the Defendant, though guilty, committed the offense under such unusual circumstances that it is unlikely she had a sustained intent to violate the law. The Defendant does not concede that she is guilty of the offense, but she argues that the record does not support a finding of a sustained intent to violate the law. The record shows that the Defendant committed two homicides due to her dissatisfaction with her access to her grandchild, her relationship with the victim, or both. The Defendant was aware of the victim's pregnancy. The Defendant perpetrated a violent attack on the victim which would have taken time to complete. The Defendant attempted to conceal her crimes by disposing of evidence, including the victim's body, in a remote location, and by cleaning the car stained with the victim's blood from the fatal attack. When questioned by the authorities, the Defendant attempted to deflect attention from her own guilt by suggesting that someone in a white van or members of the victim's family might have committed the offenses. We conclude that the court did not abuse its discretion in declining to apply mitigating weight to this factor.

The Defendant does not contest the trial court's application of the enhancement factor for the fetal victim's particular vulnerability. She argues, though that, despite the evidence that "the real perpetrator(s) wielded a deadly weapon . . . there is no proof whatsoever that [the Defendant] used a deadly weapon to inflict injury to [the victim]." The court's finding is supported by the record. As the Defendant acknowledges, the proof supports a conclusion that the victim was beaten to death with a deadly weapon. The fetal victim, likewise, died as a result of the fatal beating of the victim. The Defendant's challenge invites this court to revisit the verdict of the jury, which found beyond a reasonable doubt that the Defendant, not some unknown perpetrator or perpetrators, committed the homicides. The trial court did not err in enhancing the Defendant's second degree murder sentence based upon the use of a deadly weapon.

The Defendant also challenges the trial court's enhancement of her sentence based upon an abuse of private trust. The record shows that the Defendant cultivated a relationship with the victim in order to foster the Defendant's access to C., her biological grandchild, and K., whom the Defendant treated as a grandchild. The Defendant provided the victim with groceries, money, and babysitting services. The pregnant victim trusted the Defendant, as demonstrated by the victim's riding in the Defendant's car, along with C. and K., on the day of the victim's death. The Defendant used the victim's trust of her to commit the offenses. The trial court did not abuse its discretion in applying this enhancement factor.

Upon review, we conclude that the Defendant has failed to demonstrate any abuse of discretion in the trial court's application of enhancement and mitigating factors. We conclude, as well, that the Defendant has not demonstrated that the court abused its discretion in imposing the twenty-five-year sentence.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE